

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00323-CV

_____

IN THE MATTER OF W.S.

On Appeal from the 323rd District Court
Tarrant County, Texas
Trial Court No. 323-114792-20

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Justice Birdwell

**MEMORANDUM OPINION**

Appellant W.S. appeals the juvenile court's order transferring him from the Texas Juvenile Justice Department (Juvenile Department) to the Institutional Division of the Texas Department of Criminal Justice (Criminal Department). *See* Tex. Fam. Code Ann. § 56.01. In a single issue, W.S. argues that the juvenile court abused its discretion by transferring him to the Criminal Department to complete his sentence instead of releasing him to the parole board. We hold that the juvenile court did not abuse its discretion and affirm its transfer order.

## I. Background

In November 2020, a grand jury approved the State's petition seeking a determinate sentence against W.S. The State alleged that in January 2020, when W.S. was sixteen years old, W.S. had engaged in delinquent conduct by committing the offenses of aggravated assault causing serious bodily injury and aggravated assault with a deadly weapon.[1]

In March 2021, as part of a plea agreement, the juvenile court adjudicated W.S. of having engaged in delinquent conduct by committing the offense of aggravated assault with a deadly weapon, a second-degree felony, *see* Tex. Penal Code Ann. § 22.02(a)(2), (b), and ordered W.S. to serve a term of six years in "the [Juvenile

---

[1]By the time the State filed its petition, W.S had turned seventeen.

Department] with a possible transfer to the [Criminal Department]." By March 2021, W.S. was already seventeen-and-a-half years old.

In June 2022, the Juvenile Department informed the juvenile court that W.S. would not complete his statutory minimum period of two years' confinement for his offense by his nineteenth birthday (which would occur in August 2022), and was, thus, subject to a hearing to determine whether he should be "transferred to the Institutional Division or released to the Parole Division of the [Criminal Department]." *See* Tex. Fam. Code Ann. § 54.11. Under Section 245.051(c)(3) of the Texas Human Resources Code, the Juvenile Department was not authorized to release W.S. "under supervision" without the juvenile court's approval because W.S. had not yet served a minimum two years for a second-degree felony. *See* Tex. Hum. Res. Code Ann. § 245.051(c)(3).

In addition to releasing W.S. to the Parole Division of the Criminal Department, the juvenile court also had the authority to transfer W.S. to the Institutional Division of the Criminal Department to complete his sentence provided W.S.'s conduct indicated that "the welfare of the community require[d] the transfer." *See id.* § 244.014(a). As the testimony later showed, however, the Juvenile Department was effectively asking the juvenile court for approval to release W.S. on parole. *See id.* § 245.051(d).

In August 2022, after a hearing, the juvenile court ordered W.S. to "be immediately . . . transferred to the care, custody[,] and control of the [Criminal

3

Department] in accordance with the provisions of Section[] 245.151(c) of the Texas Human Resources Code, and [S]ection 54.11 of the Texas Family Code, therein to serve the remainder of his sentence as required by law." *See* Tex. Fam. Code Ann. § 54.11(i)(2); Tex. Hum. Res. Code Ann. § 245.151(c). W.S. appealed.

## II.  The Law Concerning Transfer Orders

When the Juvenile Department refers a juvenile who is serving a determinate sentence to a juvenile court for a possible transfer to the Criminal Department, the juvenile court must set a hearing. Tex. Fam. Code Ann. § 54.11(a). In W.S.'s case, at the conclusion of the hearing, the juvenile court could either (1) order the juvenile returned to the Juvenile Department or (2) transfer the juvenile to the Criminal Department to complete his sentence. *See id.* § 54.11(i).

But if the juvenile court ordered the juvenile returned to the Juvenile Department, it could do so with or without approval to release him under supervision. *See id.* § 54.11(j). Thus, if the juvenile court ordered him to complete his sentence in the Criminal Department, the Juvenile Department would later transfer him to the Institutional Division of the Criminal Department. *See* Tex. Hum. Res. Code Ann. § 245.151(c). But if the juvenile court approved release on parole, on his nineteenth birthday, the Juvenile Department would transfer him to the Parole Division of the Criminal Department. *See id.* § 245.151(e).

In making the decision whether the juvenile should be paroled or ordered to complete his sentence, the trial court

4

may consider the experiences and character of the person before and after commitment to the [Juvenile Department] or post-adjudication secure correctional facility, the nature of the penal offense that the person was found to have committed and the manner in which the offense was committed, the abilities of the person to contribute to society, the protection of the victim of the offense or any member of the victim's family, the recommendations of the [Juvenile Department], county juvenile board, local juvenile probation department, and prosecuting attorney, the best interests of the person, and any other factor relevant to the issue to be decided.

Tex. Fam. Code Ann. § 54.11(k); *see In re A.M.*, No. 02-17-00029-CV, 2017 WL 2812452, at *4–5 (Tex. App.—Fort Worth June 29, 2017, no pet.) (mem. op.); *In re H.C.*, No. 02-15-00149-CV, 2016 WL 354297, at *2 (Tex. App.—Fort Worth Jan. 28, 2016, no pet.) (mem. op.) (explaining that under Section 54.11(k), "the trial court may assign different weights to the factors it considers, and the court need not consider every factor").

## III. Standard of Review

We review a trial court's decision to transfer a juvenile from the Juvenile Department to the Criminal Department for an abuse of discretion. *A.M.*, 2017 WL 2812452, at *5; *In re K.Y.*, 392 S.W.3d 736, 737 (Tex. App.—Dallas 2012, no pet.); *In re J.D.P.*, 149 S.W.3d 790, 792 (Tex. App.—Fort Worth 2004, no pet.). "We are to review the entire record to determine whether the trial court acted without reference to any guiding rules and principles. We may not reverse a trial court's decision merely because we disagree with that decision, so long as the trial court acted within its discretionary authority." *J.D.P.*, 149 S.W.3d at 792 (citation omitted). An abuse of

5

discretion does not occur when some evidence of substantive and probative character supports the trial court's decision. *See A.M.*, 2017 WL 2812452, at *5; *K.Y.*, 392 S.W.3d at 737.

## IV. Discussion

In W.S.'s brief, his primary argument to support his contention that the juvenile court abused its discretion is that the Juvenile Department itself recommended not transferring him to the Criminal Department to complete his sentence. Instead, it recommended having him released on parole.

The State acknowledges that some evidence supported parole. But the State adds that "there was unquestionably sufficient evidence in the record to support the trial court's discretion in deciding to transfer [W.S.] to [the Criminal Department]" to complete his sentence.

We agree with the State.

## A. Evidence

### 1. The Master File

At the start of the hearing, the juvenile court admitted into evidence the Juvenile Department's master file for W.S. The master file contained a description of W.S.'s underlying offense.

According to the master file, multiple people had "jumped" W.S.'s friend. Two days later, W.S. and his friend saw the victim—a peer W.S. claimed was involved in the "jumping" of his friend—outside a gas station.

The victim, however, had not participated in the "jumping" but had, instead, associated with the youths who had "jumped" W.S.'s friend. Nevertheless, W.S.'s friend approached the victim, started a fight with him, and stabbed him multiple times with a knife. The victim ran behind the gas station, where W.S. and his friend pursued him and continued the assault.

W.S. purportedly brandished a handgun and shot at the victim four times. How many bullets struck the victim was not clear: "Records do not note the number of gunshot wounds suffered by the victim, but it is noted that the victim was shot in the leg and was also observed doubled over in video after a shot went off, possibly indicating he was additionally shot in the abdomen."

After the assault, W.S. and his friend absconded to Mexico, where they remained for seven months. Authorities arrested W.S. when he attempted to re-enter the United States.

### 2. The Juvenile and Criminal Departments' Court Liaison

The State called as its only witness Maricela Amador, who was a court liaison for the Juvenile and Criminal Departments. She acknowledged that W.S. had been admitted to the Juvenile Department for the offense of aggravated assault with a deadly weapon for which he had received a six-year determinate sentence and that W.S. had been in the Juvenile Department's custody for about seventeen months. The issue, Amador explained, was that the minimum confinement period in the Juvenile Department for a second-degree felony was twenty-four months.

### a. Incidents While at the Juvenile Department

Amador estimated that W.S., while at the Juvenile Department, had about forty incidents on record. Of those, three rose to the level of requiring Level II hearings.[2]

The most recent incident was in October 2021; it was for stealing an iPad. As a result of the Level II hearing, W.S. was demoted to Stage 1 and had his privileges suspended.[3]

W.S.'s second Level II hearing was in July 2021. On that occasion, he had participated in a food fight in the cafeteria that had caused a major campus disruption.

The third and oldest incident occurred in June 2021. W.S. had refused to go to his room at bedtime. The incident involved not just W.S. but a group of ten youths, who—rather than going to their rooms as instructed—"locked their arms together." Ultimately, staff had to either escort or carry the youths to their rooms.

---

[2]Contextually, a Level II hearing appears to be a disciplinary hearing. *See In re M.J.-M.*, No. 02-14-00367-CV, 2015 WL 4663978, at \*1 (Tex. App.—Fort Worth Aug. 6, 2015, no pet.) (mem. op.) (discussing juvenile's violation of "twenty-six major rules," which "result[ed] in sixteen Level II hearings" while serving his sentence in the Juvenile Department).

[3]Amador explained that the Juvenile Department had five stages with the first being Stage 1; a juvenile is assigned Stage 1 when admitted to the Juvenile Department. Before a juvenile can be promoted to a different stage, the juvenile must complete certain objectives, such as behavior requirements, educational requirements, and overall progress. The progressions go as follows: Stage 1, Stage 2, Stage 3, Stage 4, and Stage YES, which is an acronym for Youth Empowerment Stage.

### b. Rehabilitation

Regarding rehabilitation, Amador stated that W.S. had been referred to the capital-and-serious-violent-offender treatment program, which was the most intensive treatment program that the Juvenile Department offered to violent offenders. Although W.S. completed the program, Amador added that he had done so unsuccessfully. She explained,

> Although he had worked through the sessions within the workbook, towards the end of it when his overall participation was reviewed, it was determined that he did not truly take accountability for his offense, and he wasn't demonstrating the components that were necessary for them to evaluate him as a successful completion.

W.S. had also been placed in an alcohol-and-drug treatment group, which he successfully completed. Additionally, W.S. had sat for the GED exam, but he failed parts of it.

Amador explained that the minimum time to advance from Stage 1 to Stage 2 was thirty days. By comparison, W.S. took about six months to make the transition. She acknowledged that the six-month period that W.S. needed to advance to Stage 2 was unusual.

### c. Moderate Risk for Violent Recidivism

A psychologist evaluated W.S. The psychologist found W.S. to be a moderate risk for violent recidivism.

### d. Juvenile Department's Recommendation

Amador stated that the Juvenile Department's recommendation was to transfer W.S. to the Parole Division of the Criminal Department. She explained,

> Although . . . he was not able to complete his primary need for violent offending, he was able to demonstrate still that he had determination to complete the program. He eventually came to have a better understanding of his victim, developing and demonstrating empathy, along with demonstrating eagerness to obtain his . . . general education diploma as well as earning a vocational certification.

Amador acknowledged that she was aware that W.S.'s offense involved his shooting at someone on the ground four times.

Amador was not sure, however, what others in the Juvenile Department knew. Amador explained that the executive director of the Juvenile Department, who made the ultimate decision, did so based on the recommendations originating

> from the people that work closest with [W.S.]; his case manager, his dorm leader, the facility superintendent, the manager of clinical services at the facility. They're the ones closest to him that have been able to gain that assessment of his progress. They compile their information together when submitting it into the database that is then reviewed by the executive director.

Amador acknowledged, however, that for reasons involving W.S.'s privacy, the staff making those recommendations might not have known the specifics of his underlying offense.

## B. Arguments

The State advocated transferring W.S. to the Institutional Division of the Criminal Department. The State noted the violent nature of the underlying offense

during which W.S.'s friend had stabbed the victim multiple times even before W.S. had shot the victim. The State also questioned W.S.'s ability to successfully assimilate back into the community without being a danger to others.

In contrast, W.S.'s counsel argued that W.S. had an IQ of 83[4] and that he might not rehabilitate as quickly as other people. W.S.'s counsel also argued that the offense had happened four-and-a-half years earlier and that young people change.[5]

## C. The Juvenile Court's Ruling

When making its ruling, the juvenile court explained to W.S. at length why it thought it necessary to transfer him to the Criminal Department to complete his sentence. The juvenile court was aware of the underlying offense's facts and commented that but for the plea bargain, in its estimation, if W.S.'s case had gone to a jury, a jury would have likely assessed a punishment far greater than six years. The juvenile court also noted that W.S. had not shown any desire to change his behavior while at the Juvenile Department until his transfer hearing became imminent and opined,

> I think if I was to parole you, you would go back to being a drug dealer, having guns and threatening people and being disruptive, and that's the reason why I'm transferring you is I just don't think you've matured enough and you've been rehabilitated. I feel like our community is in danger.[6]

---

[4]The record supports counsel's assertion that W.S.'s IQ was 83.

[5]The offense had occurred in January 2020, and the transfer hearing was in August 2022, so the offense had occurred about two-and-a-half years earlier.

[6]An incident report from February 21, 2022, showed that during a routine cell search, W.S. was found with communications with another youth that described

11

Finally, the juvenile court noted that even though W.S.'s offense was an aggravated one with stiffer parole requirements, given W.S.'s short sentence, W.S. would soon become eligible for parole in any event.[7]

## D. Analysis

Some evidence of substantive and probative character supports the juvenile court's decision; thus, the juvenile court did not abuse its discretion. *See A.M.*, 2017 WL 2812452, at *5; *K.Y.*, 392 S.W.3d at 737. After arriving at the Juvenile Department, W.S. continued to violate basic rules, such as when he stole property from others. He also showed a penchant for not following verbal instructions, such as when he refused to go to his room when told and when he stole bags of chips even after being told not to.[8] W.S.'s ability to contribute positively to society was questionable because he had not yet passed his GED (making gainful employment

_____

detailed plans to trick the parole officers and to continue criminal activity such as selling drugs and committing robberies.

[7]The juvenile court referred to W.S.'s offense as a "3G" offense, which refers to former Section 3g of Article 42.12 of the Texas Code of Criminal Procedure. *See State v. Kahookele*, 604 S.W.3d 200, 208 (Tex. App.—Austin 2020), *aff'd*, 640 S.W.3d 221 (Tex. Crim. App. 2021); *Hervey v. State*, No. 05-17-01040-CR, 2018 WL 3198401, at *2 (Tex. App.—Dallas June 29, 2018, no pet.) (mem. op., not designated for publication). The current provision is located in Article 42A.054 of the Texas Code of Criminal Procedure. *See* Tex. Code Crim. Proc. Ann. art. 42A.054(b)(2)(A), (c). When a judgment contains a deadly weapon finding, an inmate is "not eligible for release on parole until the inmate's actual calendar time served, without consideration of good conduct time, equals one-half of the sentence or 30 calendar years, whichever is less, but in no event is the inmate eligible for release on parole in less than two calendar years." Tex. Gov't Code Ann. § 508.145(d)(2). The juvenile court's transfer order credited W.S. with 517 days detained—a little less than a year and a half.

12

difficult) and because stealing, drug dealing, and robberies (some alternatives to gainful employment) are not considered positive contributions to society. W.S. was a moderate risk to violently reoffend. Although W.S. had shown some signs of promise while in the Juvenile Department, the juvenile court could have reasonably questioned whether he had made sufficient progress.

And although the Juvenile Department recommended parole, whether the persons recommending parole to the executive director were even aware of W.S.'s underlying offense was not clear. In contrast, the prosecuting attorney was aware of W.S.'s underlying offense, and she recommended a transfer to the Criminal Department to complete his sentence:

> The State is arguing . . . that transfer to [the Criminal Department] is more than appropriate in this case. [W.S.], his underlying offense is an aggravated assault deadly weapon which, frankly, should have been a murder. He shot the victim four times. His co-respondent started the fight, stabbed the victim multiple times before [W.S.] shot him, and by the grace of God the victim survived. The shots were also fired at close range.

The prosecutor also emphasized W.S.'s failure to take accountability: "I noticed in the master file that . . . [W.S.] described the offense" as his trying "to scare the dude [by] brandish[ing] his firearm. He then stated, quote, [']I turned back and three gunshots went off.['] That . . . says it all, Judge. There's no accountability there." We note, though, that the report to which the prosecutor referred was dated April 5,

---

[8]In February 2022, W.S. ran to a Mrs. Baird's food trailer and started throwing bags of chips to his friends. When told to stop, W.S. refused and continued to toss bags of chips to his friends.

2021. W.S. was admitted to the Juvenile Department only about two weeks earlier, on March 23, 2021. On the other hand, W.S. had failed the capital-and-serious-violent-offender treatment program precisely because he had failed to take accountability for his offense.

A psychologist who evaluated W.S. in June 2022 also recommended parole. The legislature, however, entrusted the juvenile court—not the psychologist who had evaluated W.S. and not the executive director of the Juvenile Department—to make the ultimate decision whether to release W.S. back into society while on parole or to transfer him to the Criminal Department to serve out his sentence. And while the psychologist and the Juvenile Department saw enough improvement in W.S. to risk parole, the juvenile court had evidence before it that W.S. posed a danger to the community. The juvenile court therefore did not abuse its discretion by transferring W.S. to the Institutional Division of the Criminal Department.

We overrule W.S.'s issue.

## V. Conclusion

Having overruled W.S.'s sole issue, we affirm the juvenile court's order transferring W.S. to the Criminal Department.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: March 2, 2023

14